**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Raymond Laws, | ) | No. CV-12-0697-TUC-BGM |
| Plaintiff, | ) | |
| vs. | ) | **ORDER** |
| Carolyn W. Colvin, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 29). Defendant filed her response (Doc. 30), and Plaintiff did not reply. Also pending is Plaintiff's Motion to Allow Plaintiff's Opening Brief to Exceed Page Length filed with his Opening Brief (Doc. 29). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. The Court takes judicial notice that Michael J. Astrue is no longer Commissioner of the Social Security Administration ("SSA"). The Court will substitute the new Acting Commissioner of the SSA, Carolyn W. Colvin, as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

. . .

. . .

. . .

. . .

1  **I.      BACKGROUND**

2         *A.      Procedural History*

3         On July 28, 2008, Plaintiff filed an application for Social Security Disability

4  Insurance Benefits ("DIB") alleging disability as of June 7, 2006 due to degenerative joint

5  disease of the lumbar and cervical spine and fracture of the left upper extremity.[1] *See*

6  Administrative Record ("AR") at 24, 26, 102, 104, 117, 124, 167.  The Social Security

7  Administration ("SSA") denied this application on October 16, 2008.  *Id.* at 79.  On

8  December 7, 2008, Plaintiff filed a request for reconsideration, and SSA subsequently denied

9  Plaintiff's request.  *Id.* at 83-86.  On June 22, 2009, Plaintiff filed his request for hearing.

10 *Id.* at 94.  On August 25, 2010, a hearing was held before Administrative Law Judge ("ALJ")

11 Norman R. Buls.  *Id.* at 65.  The ALJ issued an unfavorable decision on December 15, 2010.

12 AR at 21-33.  Plaintiff requested review of the ALJ's decision by the Appeals Council, and

13 on July 18, 2012, review was denied.  *Id.* at 1-3.  On September 21, 2012, Plaintiff filed this

14 cause of action.  Compl. (Doc. 1).

15        *B.      Factual History*

16        Plaintiff was forty-four (44) years old at the time of the administrative hearing, and

17 forty (40) at the time of the alleged onset of his disability.  AR at 69, 104, 124, 132, 147, 167.

18 Plaintiff earned high school equivalency by passing his GED exam.  *Id.* at 70, 167.  Prior to

19 his alleged disability, was a truck driver in the military.  *Id.* at 72, 118, 150, 167.  Plaintiff

20 also worked for Waste Management Resources as a truck driver and trash collector.  *Id.* at

21 72-73, 118, 128.  Plaintiff left Waste Management, because he was recalled to active duty.

22 *Id.* at 73.

23        At the administrative hearing, Plaintiff testified that he currently lives with his

24 daughter and her boyfriend, and his two grandchildren.  AR at 70.  Additionally, Plaintiff has

25

26

27        [1]Plaintiff describes the causes of his alleged disability as "[b]ack problems/left shoulder and arm problems[.]" AR at 117.

28                                                  - 2 -

1    two (2) minor children aged eight (8) and twelve (12). *Id.* at 70. Plaintiff further testified

2    that he had been dropped off at the hearing by a friend, although he does have a driver's

3    licence and owns a vehicle. *Id.* at 70-71. Plaintiff testified that he no longer has his

4    commercial driver's licence. *Id.*

5        Plaintiff testified that he last worked in August 2004, when he "returned to the

6    military." *Id.* at 71. Plaintiff further testified that he retired from the military in April or

7    May of 2006. AR at 71-72. Plaintiff testified that while in the military he was a truck driver.

8    *Id.* at 72. His retirement from the military resulted from a fall "out of a military vehicle on

9    a training mission." *Id.* at 72. Plaintiff testified that after the fall, he "started dropping my

10    rifle, and I actually had incidents of passing out[.]" *Id.* Plaintiff further testified that "from

11    there things kind of went downhill for [him]. [He] started having a lot of problems on my left

12    shoulder[,] [including a] bent [] clavicle plate[,] [and] . . . a lot of problem[s] on [his] left

13    hand." *Id.*

14        Plaintiff testified that since retirement he has "a lot of trouble sleeping." AR at 73.

15    Plaintiff further testified that his sleep pattern is very "erratic" and that he is only able to

16    sleep "two or three hours at a time." *Id.* Additionally, Plaintiff testified that he has a lot of

17    trouble with his left hand, and cannot lift anything. *Id.* at 73. Plaintiff also testified that he

18    has been falling a lot, and now walks with a cane. *Id.* Plaintiff further testified that "they"

19    are looking into why he falls, and that "[t]hey don't know whether I pass out, or whether my

20    legs give out on me[.]" *Id.* Plaintiff testified that he cannot work at a table height, because

21    it causes his arms to go numb, and he develops severe headaches. AR at 73-74. Plaintiff also

22    testified that he is "on high levels of morphine, and other medications." *Id.* at 74.

23        Plaintiff described his usually morning, stating that he usually wakes up between four

24    (4) and six (6) in the morning. *Id.* at 74. "Before [he] get[s] out of bed, [he] start[s] some

25    stretches that the doctor has put [him] on to relieve the tension." *Id.* Once up, Plaintiff

26    testified that he has a cup of coffee, watches a little bit of television, "and then plan[s] [his]

27    day from there." *Id.*

28

1    Plaintiff testified that his daughter does his laundry, and either his ex-girlfriend does

2    his grocery shopping or he has groceries delivered.  AR at 74.  Plaintiff further testified that

3    he does not cook anymore, because it is "too dangerous in the kitchen." *Id.* at 75.  He

4    previously "dropped a whole pan of pinto beans in [sic] the kitchen floor, and [] actually

5    burnt [his] feet really bad[.]" *Id.*  Plaintiff testified that he tries to go on the computer, but

6    that "it gives [him] a lot of eyestrain, and [he] can't seem to find a real comfortable position."

7    *Id.*  Plaintiff further testified that he does not have hobbies "any more." *Id.* at 75.

8    On November 30, 2005, Plaintiff was seen by Donna R. Rojas, case manager/medical

9    holdover liaison, at Lackland Air Force Base.  AR at 322.  Plaintiff was being seen "for

10   further medical evaluation for possible MEB."[2] *Id.*  Plaintiff stated that he had been in an

11   accident in September 2004, and this his primary concern is his pain which he rates a six (6)

12   out of ten (10). *Id.*  Plaintiff indicated that the pain was from the middle of his back up to

13   his neck, as well as his lower back and tailbone. *Id.*  Plaintiff further stated that he has a wife

14   and six (6) children in Arizona. *Id.*  Ms. Rojas scheduled Plaintiff for a consult with Dr.

15   Unser. *Id.*  Plaintiff's active medications included two Cyclobenzaprine HCl prescriptions,

16   Nortriptyline HCl, Ibuprofen, and Gabapentin.  AR at 322.

17   On December 1, 2005, Plaintiff was seen by Stanley H. Unser, M.D. regarding his

18   lower back pain and left cervical radiculopathy since his fall from a truck at on September

19   16, 2004. *Id.* at 321.  Dr. Unser also noted Plaintiff had "[c]hronic CP since pleural adhesion

20   procedure for pneumothorax in 1995 with mild restrictive disease on PFT no duty limiting[,]

21   . . . [m]ild pericardial effusion Sep 05 without follow up[,] [and] . . . small lession [sic] on

22   Spleen[.]" *Id.*  Plaintiff was scheduled for neurology and cardiology consults. *Id.*  Plaintiff

23   was seen on this same date by Cynthia Krueger, RN for a check of his vital signs for the

24   medical board. *Id.* at 320.  Plaintiff's listed problems were pericarditis effusive, cervical

25

26   _____

27   [2]MEB is the Medical Evaluation Board.  This refers to the process for military retirement due
     to physical disability.  *See* 10 U.S.C., Chapter 61.

28                                              - 4 -

radiculopathy C5, and lumbago.[3]  AR at 320.  On December 2, 2005, Plaintiff was seen by Huong-Trinh Nguyen, a staff optometrist, for a "vision examination as part of a military physical."  *Id.* at 319.  Plaintiff was seen by Eduardo J. Perez on the same date for magnetic resonance imaging ("MRI") of his spine.  *Id.* at 317-18.  Dr. Perez documented that Plaintiff's primary complaint was "[u]pper thoracic cervical pain with left shoulder weakness" after a fall off of a military truck. *Id.* at 317.  Dr. Perez noted "progressive symptomatology inspite [sic] of physical therapy."  *Id.*  Plaintiff "also complain[ed] of left arm numbness in ulnar distribution with droping [sic] of object but that is slowly improving."  AR at 317.  Plaintiff rated his pain six (6) out of ten (10).  *Id.*  Dr. Perez noted that Plaintiff's cervical spine motion, including flexion and extension were abnormal.  *Id.* at 318.  Further, cervical spine pain was elicited by motion.  *Id.*  Dr. Perez did not note any tenderness on palpation or instability.  *Id.*  "A distraction test of the cervical spine was negative."  AR at 318.  Foraminal compression test did not cause pain to radiate.  *Id.*  The cervical MRI did not show "acute herniation or spinal or foraminal stenosis related to his symptoms[,] [and] . . . disk height [was] well conserved."  *Id.* at 318.  Dr. Perez stated that Plaintiff's "presentation is a combination of cervicalgia and upper back musculoskeletal complaints."  *Id.*  Plaintiff's lumbar spine MRI showed "desecation [sic] of L5S1 with conservation of height and no compressive lesions."  *Id.*  Dr. Perez stated that Plaintiff's presentation "favors" a diagnosis of cubital tunnel syndrome on the left side; "however[,] this is masked by the severity of his other complaints."  AR at 318.  Plaintiff was released with work/duty limitations.  *Id.*  On December 5, 2005, Plaintiff received his flu shot.  *Id.* at 315-16.  On December 6, 2005, Plaintiff received a hearing test for the MEB.  *Id.* at 314.  The test was given, and Plaintiff was released without limitations.  *Id.*  On December 7, 2005, Plaintiff was seen by Family Nurse Practitioner ("FNP") Thomas S. Clark, F.N.P. regarding his neck and back pain for the MEB.  AR at 310.  Plaintiff also needed refills of his prescriptions.  *Id.* at 310, 311.

---

[3]Patient counseling was also included in this list.  AR at 320.

1  Plaintiff reported his pain as a four (4) out of ten (10). *Id.* at 310. Further, his upper back

2  pain was "well control[led] with medication." *Id.* at 310. FNP Clark noted "[n]ormal

3  movement of all extremities[,]" but "[c]ervical spine showed abnormalities[,] [p]ain when

4  moving in any direction." *Id.* at 313. Further, Plaintiff's "motor exam demonstrated no

5  dysfunction" and his balance was "normal." AR at 313. FNP Clark noted severe cervicalgia,

6  and refilled Plaintiff's Oxycodone and Flexeril prescriptions; benign essential hypertension,

7  which is stable and controlled; and chronic constipation, induced by narcotic therapy. *Id.*

8  Plaintiff was released without limitations. *Id.* Later the same date, Plaintiff called for a

9  telephone consultation, stating that FNP Clark believed the "EJP note" was incomplete, and

10 that Plaintiff "need[ed] to get more information added per Dr. Clark." *Id.* at 308. Dr. Perez

11 reviewed the note and confirmed that it was complete. *Id.* at 309.

12         On January 3, 2006, Plaintiff called for a prescription refill on his Oxycontin,

13 Oxycodone, and Flexeril. AR at 306. FNP Michael F. Daly reviewed the prescriptions and

14 instructed staff to determine if Plaintiff had a "sole prescriber." *Id.* at 307. A refill was

15 ordered for the Oxycodone (Oxycontin) as it was previously written; however, FNP Daley

16 noted that Plaintiff was given a ninety (90) day supply of Flexeril, and if he is out he is taking

17 it incorrectly. *Id.* On the same date, Plaintiff had a consultation with Case Manager Rojas,

18 regarding medication and treatment. *Id.* at 304. Consultations with general surgery, pain

19 clinic and cardiology were also scheduled for Plaintiff. *Id.* at 305. On January 10, 2006,

20 Plaintiff was seen by Garrett Shawn Lynchard, M.D. for a cardiology consult. AR at 300.

21 Dr. Lynchard noted "chronic daily chest pain increased with exertion." *Id.* A Transthoracic

22 Echocardiogram ("ECG") was performed. *Id.* at 302. Plaintiff's "[l]eft ventricular systolic

23 function was at the lower limits of normal." *Id.* Additionally, Plaintiff's lab results indicated

24 high total cholesterol, high LDL cholesterol, and low potassium. *Id.* at 302. Dr. Lynchard

25 noted Plaintiff's "abnormal ECG and significant [coronary artery disease] [("]CAD["]) risk

26 factors. AR at 303. Dr. Lynchard recommended further evaluation, and beginning statin

27 therapy. *Id.* On January 11, 2006 Plaintiff was seen by FNP Daley regarding his high

28

cholesterol, chronic abdominal pain, and claustrophobia and upcoming MRI. *Id.* at 296-98. Plaintiff reported that "he is being followed in the pain clinic and is getting injections" for his chronic back pain. *Id.* at 297. Plaintiff further reported abdominal pain on the left side, which FNP Daley also noted on palpation. *Id.* at 298. Plaintiff was given a prescription for Valium to take prior to his scheduled MRI. AR at 299. On the same date, Plaintiff reported to Case Manager Rojas that he had been seen at the Pain Management clinic and received "7 shots." *Id.* at 295. Plaintiff further stated that the injections made him sore. *Id.* Plaintiff also stated that Percocet, a new medication, makes him nauseated. *Id.* at 295. On January 12, 2006, Plaintiff was seen by Nhat C. Nguyen-Minh, M.D. regarding left abdominal pain, and evaluation for MEB. *Id.* at 291-93. Plaintiff reported his abdominal pain as present for nine (9) months, and constant, dull and mild in quality. AR at 292. Dr. Nguyen-Minh notes that "[p]atient is a poor historian, does not remember the circumstances of his many surgeries, and has no medical records with him." *Id.* Plaintiff underwent an MRI which showed a rounded lesion in the upper tip of the spleen. *Id.* at 293. Ernesto Torres, M.D. stated that the "[d]ifferential diagnosis include[d] epithelial vs. post traumatic cyst." *Id.* Further, "[t]he spleen is not enlarged and otherwise demonstrates homogeneous signal intensity in all sequences." *Id.* Accordingly, Steven J. Hudak, M.D. stated that Plaintiff's "[s]pleen finding [was] benign, and unrelated to pain." AR at 293. Further, there were "[n]o surgical indications." *Id.* Plaintiff was released without limitations. *Id.* On January 13, 2006, Plaintiff was seen by Elizabeth A. Grossart, M.D. on referral from neurosurgery for his cervicalgia and left arm cubital tunnel syndrome. *Id.* at 285-90. Plaintiff complained of "tenderness at 'funny bone', [sic] [and] constant tingling at L[eft] hand digits 4, 5." *Id.* at 286. Plaintiff also complained of "L[eft] hand 'opening up' and dropping things." *Id.* at 286. Plaintiff reports that this began occurring after his fall from a military truck. *Id.* Plaintiff had his first cervical injection on January 6, 2006 and reported it "made [his] L[eft] thumb go numb[,] but that is now resolved." *Id.* Dr. Grossart noted that pain was elicited on flexion and extension of the elbow. The left elbow had "[t]enderness on palpation of the olecranon

bursa with no swelling[,] and [n]o tenderness on palpation over the ulnar nerve." *Id.* No other tenderness was noted. *Id.* No weakness or muscle atrophy was found. *Id.* Dr. Grossart performed nerve conduction studies. AR at 286-89. Dr. Grossart reported a normal study with "[n]o electrodiagnositc evidence of ulnar neuropathy at the elbow, forearm, or wrist." *Id.* at 286. Accordingly, Dr. Grossart found "[n]o electrodiagnostic evidence of ulnar neuropathy . . . or cervical radiculopathy." *Id.* She recommended an orthopedics consult for possible low-grade bursitis. *Id.* On January 17, 2006, Case Manager Rojas saw Plaintiff, who reported that he was "in a lot of pain today" and that it was "off the charts." *Id.* at 283-84. Plaintiff was released with work/duty limitations. AR at 284. Later the same date, Plaintiff was seen by Patricia S. Manship, RD/LD regarding his hyperlipidemia. *Id.* at 280-82. Ms. Manship reported Plaintiff could benefit from nutritional counseling, and released him without limitation. *Id.* at 281-82.

On February 9, 2006, Plaintiff was seen by Connie A. Patterson, FNP regarding his blood pressure. *Id.* at 275-79. Plaintiff reported having profuse sweating, headaches and hot flashes for a week, and having "run out of pain meds[.]" *Id.* at 276-77. Plaintiff requested refills of his Flexeril and Oxycodone. AR at 276-77. FNP Patterson noted "[t]enderness on palpation of both trapezius muscles[,]" as well as "[t]enderness on palpation of the rhomboid muscles on both sides[,]" with muscle spasms. *Id.* at 278. FNP Patterson further reported cervical pain elicited by bilateral motion, including flexion and extension, although the "[c]ervical spine showed full range of motion." *Id.* FNP Patterson also noted spasms in the sternocleidomastoid and paraspinal muscles bilaterally. *Id.* at 278. FNP Patterson refilled Plaintiff's pain medication, and noted that his blood pressure elevation was "probably secondary to pain." *Id.* at 279. Plaintiff was instructed to follow up with his primary care manager. AR at 279. On February 28, 2006, Plaintiff requested that Case Manager Rojas schedule an appointment for him regarding his acid reflux. *Id.* at 273-74.

On March 2, 2006, Plaintiff was seen by Paul Lewis, F.N.P., for his acid reflux. *Id.* at 269-72. Plaintiff complained of gastroesophageal reflux disease ("GERD"), which he was

1  treating with Prilosec; however, this was no longer effective.  *Id.* at 270.  Plaintiff further

2  reported having had an esophagogastroduodenoscopy ("EGD") which showed esophageal

3  ulcers and a hiatal hernia.  *Id.*   Plaintiff further reported that he had "regular nausea with

4  about weekly vomiting[.]"   AR at 278.   After evaluation, Plaintiff was referred to

5  Gastroenterology for follow-up, and prescribed Aciphex. *Id.* at 272.  On March 6, 2006, Dr.

6  Lynchard called Plaintiff to inform him of his abnormal MIBI stress test results. *Id.* at 267-

7  68.  Dr. Lynchard offered cardiac catheterization testing, which Plaintiff wished to think

8  about.  *Id.* at 268.  On March 7, 2006, Plaintiff contacted Case Manager Rojas regarding

9  scheduling the cardiac catheterization. *Id.* at 265-66. On March 21, 2006, Plaintiff met with

10 Case Manager Rojas.  AR at 263-64.  Plaintiff stated that "he is doing well."  *Id.*  Plaintiff

11 also reported that the "cold weather has caused his back to be a bit more painful and 'act

12 up[.]'"  *Id.* at 264.  Plaintiff and Case Manager Rojas discussed his upcoming appointment

13 with the pain management clinic.  *Id.*  Plaintiff stated that if "the next [epidural steroid

14 injection] [("]ESI["])] does not help he probably will not have additional ESI's [sic]." *Id.*  On

15 March 28, 2006, Plaintiff saw Dr. Lynchard for a follow-up and cardiac catheterization.  AR

16 at 258-62.  Plaintiff reported being pain free.  *Id.* at 259.  Dr. Lynchard performed a

17 myocardial perfusion scan which showed a "small, mild fixed anterior wall defect" and

18 "medium, mild lateral wall defect extending from the base to the mid slices." *Id.* at 261-62.

19 Dr. Lynchard reported "[l]ateral wall ischemia" and "[n]ormal LV function on resting gated

20 analysis[.]" *Id.* Dr. Lynchard further discussed cardiac catheterization with Plaintiff. *Id.* at

21 262.

22        On April 4, 2006, Plaintiff met with Case Manager Rojas, and discussed "getting

23 restless waiting here as near the end of MEB."   AR at 256-57.   Plaintiff confirmed

24 appointment for cardiac catheterization.  *Id.* at 257.  On April 5, 2006, Plaintiff underwent

25 a left heart catheterization and coronary angiography. *Id.* at 227-28; *see also* AR at 200-15,

26 219-22.  "there were no left ventricular regional wall motion abnormalities [and] . . . no

27 angiographic evidence for coronary artery disease."   AR at 227-28.   Plaintiff's

28

electrocardiograms performed on April 4 and 5, 2006 both indicated normal sinus rhythm. *Id.* at 217-18. On April 11, 2006, Plaintiff again met with Case Manager Rojas. *Id.* at 254-55. Plaintiff reported that he was "doing well" and they discussed pending appointments with Gastroenterology and Cardiology. *Id.* at 255. On April 13, 2006, Plaintiff met with Carlos E. Angueira, M.D. regarding his GERD. *Id.* at 252-53. Dr. Angueira switched Plaintiff to Prilosec and instructed him to return in one month. AR at 253. "If patient is still symptomatic at that time, we will proceed with repeat EGD." *Id.* On April 17, 2006, Plaintiff was seen by Terris M. Thompson, F.N.P. for a follow-up regarding his cardiac catheterization incision. *Id.* at 248-51. Plaintiff also reported needing a refill of his medications for hyperlipidemia, chronic pain, hypertension and constipation. *Id.* at 249, 251. Plaintiff reported being pain free. *Id.* at 249. No abnormalities with the incision were found. AR at 250. On April 18, 2006, Plaintiff was seen by Nurse Krueger for a blood pressure check, scheduled to be the first for three (3). *Id.* at 246-47. Plaintiff reported being pain free. *Id.* at 247. Plaintiff's blood pressure was 134/83 in the right arm, and 137/83 in the left. *Id.* On April 21, 2006, Plaintiff saw Nurse Krueger for his third day blood pressure check. *Id.* at 244-45. Plaintiff's left arm blood pressure was 149/95, and right arm 135/89. AR at 245. On April 24, 2006, Plaintiff was seen by Norton A. Stuart, M.D. in the Pain Management Clinic. *Id.* at 242-43. Dr. Stuart noted "[p]rogressive symptomology inspite [sic] of physical therapy." *Id.* at 242. Dr. Stuart further noted that Plaintiff "continue[d] to have significant L[eft] subscapular pain despite [trigger point injections] [("]TPI["]) x 5 with local/steroids/botox." *Id.* Plaintiff "decline[d] any more TPI and would like alternative pain management modalities." *Id.* Plaintiff rated his pain as four (4) out of ten (10). AR at 242. Upon examination, Dr. Stuart noted that Plaintiff's neck "[d]emonstrated a decrease in suppleness." *Id.* Dr. Stuart further noted "[f]lexion produced tingling down the spine/arms." *Id.* Additionally, cervical spine flexion, extension, and bilateral motion produced pain." *Id.* Dr. Stuart noted that the cervical spine "showed a full range of motion" and "no instability." *Id.* Neck and cervical spine strength was reduced, and "[s]houlder weakness was observed."

- 10 -

1    AR at 243. "A foraminal compression test did not cause pain to radiate to the arm" either on

2    the same or opposite side to which the head was rotated. *Id.* at 242. On April 25, 2006,

3    Plaintiff met with Case Manager Rojas and "denie[d] any issues at this time." *Id.* at 240-41.

4              On May 1, 2006, Plaintiff was seen by Curtis W. House, P.A., for back pain and

5    edema in feet. *Id.* at 236-39. Plaintiff reported the pain in his mid or upper back as six(6)

6    out of ten (10), with ten (10) being the worst possible pain. *Id.* at 237. Plaintiff further

7    reported that the edema in his lower extremities had been occurring two (2) to three (3) times

8    per year "for the last few years." AR at 237. Additionally, Plaintiff had "some tingling" and

9    complained that pain management had recently changed his medications to a sustained

10   release form, which did not work as well. *Id.* at 237. Plaintiff did not have any pain or

11   tenderness either on palpation or movement of his ankles. *Id.* at 238. An ECG was

12   performed with "[n]onspecific T wave abnormality." *Id.* Plaintiff was directed to follow up

13   with either the pain management clinic or his primary care manager for medication

14   adjustment. *Id.* On May 2, 2006, Plaintiff was seen by Andrew S. Fletcher, M.D. regarding

15   his mid to low back pain. AR at 231-35. Dr. Fletcher reported that Plaintiff was seeking

16   pain medication for his low back pain. *Id.* at 233. Dr. Fletcher further noted that Plaintiff's

17   hypertension was not well controlled. *Id.* This has resulted in "mild dependent edema lately,

18   which resolved with elevation of lower extremities." *Id.* Dr. Fletcher reported that Plaintiff's

19   cervical spine was tender to palpation bilaterally, and the paraspinal muscles were in mild

20   spasm. *Id.* at 234. Dr. Fletcher further reported "[p]ain with movement in all directions" and

21   that he was "unable to elicit radicular" signs and symptoms to Plaintiff's upper extremity.

22   AR at 234. Dr. Fletcher noted that Plaintiff's lumbosacral spine exhibited a limited range

23   of motion on flexion and twisting at the waist. *Id.* "No facet load pain [was] noted." *Id.*

24   Plaintiff stated that "pain with motion radiates down legs in sciatic distribution." *Id.* Dr.

25   Fletcher advised Plaintiff to follow up with the pain management clinic regarding his

26   medication. *Id.* at 235. Dr. Fletcher also offered Toradol IM, which Plaintiff refused. *Id.*

27   Dr. Fletcher prescribed Hydrochlorothiazide ("HCTZ") for Plaintiff's hypertension and

28

edema. AR at 235. On May 9, 2006, Plaintiff met with Case Manager Rojas. *Id.* at 229-30. Plaintiff was scheduled for an appointment in the MEB office regarding his Physical Evaluation Board ("PEB") appeal. *Id.* at 230. On May 16, 2006, Plaintiff was seen by Dr. Lynchard. *Id.* at 225-28. The record indicates that Plaintiff's "case manager scheduled another follow up for unclear reasons." *Id.* at 226. Further, "Plaintiff [was] without significnat [sic] complaint today[.]" AR at 226. Plaintiff was determined to be non-cardiac, with no further cardiology follow up required. *Id.* at 228. On May 18, 2006, Plaintiff was seen by FNP Daley for a medication request. *Id.* at 223-24. Plaintiff reported that he was "getting out of the military and moving to Arizona and does not want to have an interruption in medications." *Id.* at 223. Plaintiff's active list of medications indicated refills available, so no additional prescriptions were necessary. *Id.* at 223-24.

On June 19, 2006, Plaintiff was seen by Vera M. Stauth, L.P.N. at Southern Arizona Veterans Affairs Health Care System ("SAVAHCS") in Tucson, Arizona. AR at 617-18. Plaintiff was screened for depression, which was negative. *Id.* at 617. Plaintiff indicated that he was "a lifetime non-tobacco user[;]" however, his records from Brooke Army Medical Center consistently indicate that he was nicotine dependent. *Id.* at 225, 229, 231, 236, 240, 244, 246, 248, 252, 254, 256, 258, 262, 263, 265, 267, 269, 273, 275, 279, 280, 283, 285, 291, 296, 300, 303, 304, 306, 308, 313. On the same date, Plaintiff was seen by Denise M. Rhoads, M.S.N., F.N.P.-C for a primary care intake examination. *Id.* at 608-17. Plaintiff had been medically discharged from the military, and wished to establish primary care at SAVAHCS. *Id.* at 608. FNP Rhoads noted that Plaintiff "[c]ontinues with neck, and lumbar pain." AR at 608. Additionally, she reported that Plaintiff had daily "[h]eadaches, secondary to spinal injury." *Id.* FNP Rhoads further noted Plaintiff's "[s]evere, chronic neck, low back pain with radicular symptoms to bilateral arms, left leg entire length." *Id.* at 610. Upon examination, FNP Rhoads noted diminished sensation in Plaintiff's left hand, with grip strength 3/5 on the left and 4/5 on the right. *Id.* at 611. Regarding leg strength, FNP Rhoads reported 3/5 on the left and 4/5 on the right. *Id.* Additionally, she noted that Plaintiff's neck

1   range of motion was diminished with pain, and that his cervical and lumbar spine were tender

2   to palpation.  AR at 611.  FNP Rhoads further noted that the range of motion of all other

3   joints were grossly within normal limits, and that Plaintiff "change[d] position on [the] table

4   slowly and with apparent discomfort."  *Id.*  FNP Rhoads changed Plaintiff's medication list

5   by removing Atenolol and adding Lisinopril, changing Oxycontin to Oramorph,

6   discontinuing Nortriptyline, increasing Gabapentin, and replacing Albuterol with

7   Levalbuterol.  *Id.* at 612-13.  Plaintiff was also counseled regarding prescriptions and

8   procedures on refills.  *Id.* at 606-08.  On June 20, 2006, Plaintiff was seen in the pain clinic.

9   *Id.* at 604-06.  Plaintiff reported that he is not currently married, but had met a new girlfriend,

10  whom he is still with, prior to reactivation.  AR at 604.  Plaintiff further reported that he had

11  sole custody of seven (7) children, five (5) natural and two (2) adopted.  *Id.*  Plaintiff reported

12  his pain level as a four (4) out of ten (10), with ten (10) being the worst pain.  *Id.* at 605.

13  Plaintiff reported that trigger point injections "helped some" and that he had Botox injections

14  once a month for three (3) months, which "would last 2 weeks[,]" but that he "stopped

15  because shots 4-6 did not work."  *Id.*  Plaintiff further reported that he had not tried epidural

16  steroid injections, because they had not been offered.  *Id.* at 605.  On the same date, FNP

17  Rhoads reported that Plaintiff's laboratory work were normal with a small elevation in one

18  of his liver enzymes, as well as blood glucose level.  AR at 603-04.  On June 27, 2006,

19  Plaintiff was seen by Gifford Hoyer, R.Ph. for a review of his past pain medications.  *Id.* at

20  595-600.  Dr. Hoyer noted that Plaintiff's "[d]escription of pain indicates possible muscle

21  involvement from sub scapula that progresses to arm and neck[;] [however,] Patient['s]

22  descriptions of regions involved do not specificaly [sic] follow dermatome patterns and seem

23  to primarily start with muscle pain below scapula."  *Id.* at 598.  Plaintiff further reported "low

24  back pain that also seems to have involvement of muscles across low back."  *Id.*  Dr. Hoyer

25  noted that Plaintiff was "not doing any consistent exercises, stretching or strengthening."  *Id.*

26  Dr. Hoyer also counseled Plaintiff "regarding taking medications as prescribed[,]" as Plaintiff

27  was increasing doses of various pain medications.  AR at 599.  On June 29, 2006, FNP

28

1    Rhoads added Salsalate to Plaintiff's medications.  *Id.* at 602.

2        On July 21, 2006, Plaintiff was seen by Gabriele-Monika Koschorke, M.D. regarding

3 his chronic pain. *Id.* 587-95.  Dr. Koschorke noted that Plaintiff was "in no acute distress."

4 *Id.* at 590.  Dr. Koschorke noted Plaintiff's upper and lower extremity strength "5/5 except

5 for distal left upper extreemity [sic] 4/5" and "4/5 on left" lower extremity.  *Id.* at 591.  Dr.

6 Koschorke further noted decreased sensation "over posterior aspect of left forearm and digit

7 1 and 5."  *Id.*  Additionally, she reported "some tightness in neck muscles on left side only[,]

8 very painful to palpation over area of hyperalgesia nd [sic] allodynia, otherwise [within

9 normal limits], except for some pain on left elbow."  AR at 591.  Dr. Koschorke observed

10 pain in Plaintiff's cervical spine during flexion and extension, with midback pain in all

11 ranges of the lumbar spine.  *Id.*  Plaintiff also showed increased pain in his thoracic spine on

12 rotation to the right.  *Id.*  Dr. Koschorke also noted increased pain in chestwall with left

13 shoulder motion.  *Id.*  Plaintiff's gait was reported as "very slow using cane[.]" *Id.*  On July

14 31, 2006, Plaintiff did not appear for his neurology appointment with Amir Akhter, M.D.

15 *Id.* at 586.

16        On August 28, 2006, a female caller requested the delivery status of medications,

17 "stating [Patient] is in severe pain, unable to get out of bed."  AR at 586.  On August 29,

18 2006, Plaintiff "presented initially for 'out of pain medication/unable to walk (secondary to

19 pain)."  *Id.* at 582.  The record indicates that "after wait of appro[ximately] 30 minutes while

20 more acutely ill [patients] were being triaged, wife informed [the administrator on duty] that

21 now [Patient] was experiencing chest pain."  *Id.*  Christopher J. Taras, R.N. noted that

22 Plaintiff was "somewhat withdrawn and makes no eye contact during speech[,] and state[d]

23 he has had chest pain now, in addition to chronic back pain, for which he was taking

24 morphine[.]" *Id.*  Plaintiff reported his pain as an eight (8) out of ten (10), with ten (10) being

25 the worst pain.  AR at 581.  Plaintiff further reported that "he exhausted his morphine supply

26 a few days ago[,] [and] this morning he developed anterior chest pain which is in constant."

27 *Id.* at 579.  Plaintiff's pain was "nonpleuritic and not influenced by movement."  *Id.*  Further,

28

1    Plaintiff "remember[ed] a similar episode while in active duty prompting a coring angiogram

2    but he does not remember the results of that study." *Id.* Plaintiff's "[l]ecture cardiogram

3    shows sinus rhythm with diffuse T-wave inversions across precordium and inferiorly" and

4    laboratory results are noted as unremarkable. *Id.* at 580. Plaintiff "received nitroglycerine

5    without improvement, followed by morphine for his back pain." AR at 580-81. Plaintiff was

6    admitted for further evaluation. *Id.* at 353-55, 568-81. Plaintiff described his pain as a four

7    (4) out of ten (10), with ten (10) as the worst pain. *Id.* at 569. Plaintiff later reported that his

8    chest pain has ranged from four (4) to six (6) out of ten (10), with ten (10) as the worst pain,

9    for approximately one (1) week, but that he "felt that it was stable and would resolve until

10   this [morning] when the pain was worse and he brought himself into the LSU." *Id.* at 565.

11   Plaintiff further reported headaches and blurry vision for approximately one (1) week. *Id.*

12   at 566. Ron K. Lord, M.D. noted "[s]ome EKG changes" and a clean cardiac catheterization

13   three (3) months prior. AR at 567. Plaintiff also had a single view chest x-ray which

14   indicated "[b]lunting of the left costophrenic angle . . . of indeterminate chronicity." *Id.* at

15   335. On August 30, 2006, Margo Nugent, LCSW spoke with Plaintiff, who reported that he

16   lived "with his [significant other] and 7 children (ranging in age from 7 months to 19) in a

17   mobile home in Tucson." *Id.* at 559. "Prior to this admission, vet reports he was able to

18   manage his [activities of daily living] . . . without assistance, though he has trouble driving.

19   *Id.* William G. Ziarnik, M.D. noted Plaintiff's "prior [history of] 'idiopathic pericarditis' and

20   recurrent L[eft] pleural effusion/pleruodesis" with current "diffuse EKG changes[.]" *Id.* at

21   556. Plaintiff had another chest x-ray with both posteroanterior and lateral views. *Id.* at 334-

22   35. Kim Wilson, M.D. reviewed Plaintiff's films and reported that "[t]he cardiac silhouette

23   does have a rounded appearance, [but] is within normal limits in size." *Id.* at 335. Plaintiff

24   was treated with Tylenol for his headache and morphine for his right shoulder pain, which

25   he described as seven (7) out of ten (10), with ten (10) as the worst pain. AR at 552-53.

26   Plaintiff's cardiac rhythm was reported as "normal." *Id.* at 554. On August 31, 2006,

27   Charles D. Deakins, M.D. noted that Plaintiff "report[ed] episode of chest pain at 02:00

28

today, but says it then moved to his abdomen so he decided it was gas." *Id.* at 541. Plaintiff "also report[ed] pain in multiple other areas primarily his neck and shoulders." *Id.* Pericarditis was suspected, and a myocardial infarction ruled out. *Id.* at 544. On this same date, Kyaw K. Swe, M.D. evaluated Plaintiff for a rheumatology consult. AR at 389-91, 538-41. Dr. Swe stated that Plaintiff "does not have symptoms and signs to suggest autoimmune rheumatic diseases like RA/lupus/scleroderma/vasculitis." *Id.* 391, 541. Dr. Swe opined that "[c]linical suspicion of autoimmune rheumatic diseases is low at present." *Id.* Accordingly a "full rheumatological work up is not needed at this time[.]" *Id.* On this same date, Plaintiff described his pain to hospital staff as a five (5) out of ten (10), with ten (10) as the worst pain. *Id.* at 535. Plaintiff was also eating normally. AR at 534. Also on this date, Mark W. Sharon, M.D. analyzed Plaintiff's ECG which showed "[n]ormal sinus rhythm" and "[n]o pericardial effusion[.]" *Id.* at 393, 533. Dr. Sharon noted that "[t]here is equivocal thickening of the mitral and aortic valve leaflets, but otherwise the study is unremarkable." *Id.* Further, there was "no aortic insufficiency" and unremarkable Doppler study, "except for trivial mitral regurgitation and a normal mitral valve inflow pattern[.]" *Id.* at 393, 533. Dr. Sharon concluded that the was "[n]ormal LV/RV systolic function and [n]o pericardial effusion." *Id.* at 393, 534; *see* AR at 512.

On September 1, 2006, Plaintiff described his pain as four (4) out of ten (10), with ten (10) as the worst pain. AR at 529. Later this same date, Plaintiff's pain was noted as five (5) out of ten (10). *Id.* at 526. Plaintiff again reported some chest pain, which decreased to zero (0) in approximately an hour without palpitations or shortness of breath. *Id.* at 515. Plaintiff was discharged from the hospital. *Id.* at 515-25. On September 3, 2006, Troy L. Allen, RN read Plaintiff's TB test, which was negative. *Id.* at 515. On September 5, 2006, Plaintiff called to follow-up after his inpatient stay. AR at 514-15. On September 8, 2006, Plaintiff had a follow-up consultation with Deborah M. Lindsly, M.D., as well as a Pharmacology consult. *Id.* at 510-14. Dr. Lindsly noted that Plaintiff was "sitting stiffly in chair, moves carefully protecting back[.]" *Id.* at 512. On September 12, 2006, Dr. Lindsly

1    notified Plaintiff that his laboratory results "show[ed] a mild anemia with no apparent cause."

2    *Id.* at 510. On September 19, Plaintiff was seen in the Pain Clinic. *Id.* at 508-10. Plaintiff

3    reported that "[h]e enjoys completing stretches and providing care for his children." AR at

4    508. Plaintiff described his pain as "[r]adiating neck pain, shoulder pain and low back pain."

5    *Id.* He stated that his pain ranges from three (3) to ten (10) on a scale of one (1) to ten (10),

6    with ten (10) as the worst pain. *Id.* at 509. Plaintiff's posture was described as "slighting

7    [sic] kyphotic[,] [m]oves with guarded posture[.]" *Id.* Plaintiff was "inhibited with range of

8    motion[,]" but with normal gait. *Id.* Manual muscle testing was reported as 4+-5/5. *Id.* On

9    September 21, 2006, Plaintiff was seen by Julian Ballesteros, M.D. for trigger point

10   injections. AR at 507. Dr. Ballesteros reported that "Patient had prompt relief[,] pain relief."

11   *Id.* at 508. Dr. Ballesteros further reported that "Patient walked out with not [sic] problems."

12   *Id.* On November 30, 2006, Dr. Ballesteros noted that Plaintiff's previous trigger point

13   injections "allowed him to have pain relief for 3 weeks after had pain back but last week has

14   had not [sic] pain, patient prefers to have no [sic] TPIs today, he will call when really ned

15   [sic] the TPIs." *Id.* at 501.

16          On December 29, 2006, Plaintiff was seen by Sharon Farrish, A.N.P. for a

17   Compensation and Pension general medical examination. *Id.* at 487-500. Plaintiff reported

18   unemployment since May 2006. AR at 488. NP Farrish noted that Plaintiff was not using

19   an assistive device. *Id.* at 490. Regarding his lumbar and cervical spine pain, Plaintiff

20   reported "[p]ain in both neck and back with radiation to left shoulder[,] [and] [n]o radiation

21   to legs." *Id.* Plaintiff further reported that its effects on usual daily activities were severe for

22   chores, shopping exercise, sports, recreation, traveling, and bathing; moderate for dressing,

23   toileting, and grooming; and none for feeding. *Id.* Further, Plaintiff reported that this pain

24   has resulted in his unemployment. *Id.* Regarding his left elbow pain, Plaintiff reports that

25   its effects on usual daily activities is severe for sports; moderate for chores, shopping,

26   exercise, recreation, traveling, bathing, dressing, toileting, and grooming; and none for

27   feeding. *Id.* at 491. Plaintiff also attributes his unemployment to this pain. AR at 491.

28

Regarding his left shoulder pain, Plaintiff reports its effects on his usual daily activities is severe for exercise, sports, and recreation; moderate for chores, shopping, traveling, bathing, dressing, toileting, and grooming; and mild for feeding. *Id.* Plaintiff reports that his left shoulder pain has also contributed to his unemployment. *Id.* Upon examination of Plaintiff's cervical spine NP Farrish reported his gait as abnormal, but without an assistive device; flexion 45 degrees; extension 0 degrees; lateral flexion 15 degrees on both the left and right; rotation 70 degrees to the right and 50 degrees to the left; tenderness and crepitus, and paraspinal tension present; radiation present to finger tips in the left hand; sensation normal to light touch; strength 3/5 in the left hand; and upper extremity deep tendon reflexes 2+ on the right, but Plaintiff did not allow testing of the left side upper extremity. *Id.* at 494. Upon examination of Plaintiff lumbar and thoracic spine, NP Farrish reported Plaintiff's gait as slow, mild forward flexion with pain and no assistive device; flexion 10 degrees; extension 0 degrees; lateral flexion 15 degrees to the right and left; rotation 15 degrees to the right and left; positive straight leg raises on the left and right; normal curvature of the spine; pelvic tilt with forward flexion 5 degrees; no paraspinal tenderness, but tension present; able to stand on toes and heels; left extremity reflexes 2+/4; strength 5/5; and intact sensory to light touch to lower extremities. *Id.* at 494-95. Upon examination of Plaintiff's left shoulder, NP Farrish reported significant atrophy of the deltoid muscle; 120 degrees flexion; 40 degrees extension; 140 degrees abduction; internal rotation 60 degrees; external rotation 60 degrees; crepitus; no effusion; impingement; and muscle strength 3/5. AR at 495-96. NP Farrish also noted that she was "[u]nable to do repetitive overhead testing due to pain." *Id.* at 496. On this same date, Plaintiff had an x-rays of his left elbow, left shoulder, and clavicle. *Id.* at 331-34. "No significant abnormality [was] identified" in his left elbow. *Id.* at 334. The x-ray of Plaintiff's left shoulder indicated "[p]ost-surgical and post-traumatic deformity of the left clavicle with mild degenerative changes[.]" *Id.* at 333. Plaintiff's "[l]eft clavicle films show[ed] superior bowing presumably on a post traumatic basis involving the mid-distal shaft of the clavicle." AR at 332. Further, "[t]here appear[ed] to be disruption of the plate

1    at the apex of the bowing." *Id.*

2            On January 16, 2007, Plaintiff was seen at SAVAHCS for a "CP Pulmonary function

3    test," which was performed with normal results. *Id.* at 619. On January 22, 2007, Plaintiff

4    called regarding his medications and reported that he had "used all the medications I have

5    available. I need more morphine today." *Id.* at 483. Plaintiff also had questions about the

6    discontinuation of Gabapentin. *Id.* Dr. Hoyer noted that the Gabapentin was discontinued

7    due to patient reporting adverse effects, and replaced with Zonisamide. AR at 484. On

8    January 29, 2007, Plaintiff saw Dr. Lindsly for a routine appointment. *Id.* at 478-82. Dr.

9    Lindsly re-prescribed Gabapentin, as Plaintiff reported that he was not taking Zonisamide.

10   *Id.* at 479. Dr. Lindsly noted Plaintiff as a "chronically ill appearing 40yo male[.]" *Id.* at 481.

11   On this same date, Plaintiff met with Rosemary Valenzuela, LPN and received a preventative

12   medicine handout. *Id.* at 477.

13           On June 19, 2007, Plaintiff requested a referral for trigger point injections. AR at 467.

14   On July 9, 2007, Plaintiff was seen by Marie Angeli Adamczyk, M.D. for primary care

15   treatment. *Id.* at 462. Plaintiff again requested to return to Dr. Ballesteros's clinic for trigger

16   point injections. *Id.* Plaintiff also reported frequent falls, because his legs give out –

17   Plaintiff denied lightheadedness. *Id.* Dr. Adamczyk reported Plaintiff appeared "healthy"

18   and ambulated "slowly." *Id.* at 464. Dr. Adamczyk further noted cervical stenosis with

19   weakness of arm and leg on the left side. AR at 465. Dr. Adamczyk also expressed concern

20   regarding Plaintiff's care of his eighteen (18) month old and four (4) year old children in

21   light of his left side muscle weakness. *Id.* at 461.

22           On July 9, 2007, Plaintiff had x-rays of his cervical spine. *Id.* at 330-31. "Frontal,

23   lateral, swimmer's lateral, odontoid, and bilateral oblique views" were obtained. *Id.* at 331.

24   Early disc disease at C5-C6 was reported with a "slight disc height loss" and "slight spurring

25   on the right[.]" *Id.* "Neural foramina appear[ed] patent[,] and [p]osterior facet joints [were]

26   unremarkable." AR at 331. On July 10, 2007, the Department of Veterans Affairs issued its

27   "Rating Decision" regarding Plaintiff. *Id.* at 734-45. Plaintiff was granted, effective May

28                                              - 19 -

27, 2006, an evaluation of forty (40) percent for degenerative joint disease of the lumbar spine; thirty (30) percent for asthma; ten (10) percent for degenerative joint disease of the left shoulder; ten (10) percent for degenerative joint disease of the cervical spine; ten (10) percent for left cubital tunnel syndrome; ten (10) percent for hypertension; ten (10) percent for tinnitus; zero (0) percent for hiatal hernia with ulcerative esophagitis; and zero (0) percent for hearing loss. *Id.* at 734-43. Additionally, Plaintiff was denied for hearing loss, left ear; atypical chest pain; splenic cyst; and headaches. *Id.* at 735, 743-45. As such, Plaintiff's overall or combined rating was determined to be eighty (80) percent. *Id.* at 748. On July 27, 2007 Plaintiff went to the emergency department complaining of chest pain. AR at 454-60. A single frontal view chest x-ray indicated "[n]o acute cardiopulmonary abnormality." *Id.* at 330. As such, Harut Panossian, M.D. reported that the pain was non-cardiac, and Plaintiff was given a GI cocktail, and 30 mg of Toradol. *Id.* at 460.

On September 18, 2007, Plaintiff followed up with Dr. Adamczyk. *Id.* at 444-46. Plaintiff reported that the "cane really has helped prevent falls when his leg buckles[.]" *Id.* at 444. Additionally, "insomnia better with cyclobenzaprine[.]" *Id.* Dr. Adamczyk noted that she had certified that "he is on opiates and cannot drive while on them, [and] cannot be employed in any capacity that requires driving, non-sedated state[.]" AR at 444. Additionally, she certified "that he is less than 100% disabled for hunting[.]" *Id.* Dr. Adamczyk reported that Plaintiff exhibited "slow[,] difficult walking," but was "not in distress[.]" *Id.* at 445. Dr. Adamczyk reviewed Plaintiff's cervical spine MRI from August 8, 2007, which indicated "[m]ild degenerative changes at C5-C6[,] [but] [o]therwise essentially unremarkable study." *Id.* at 329, 443, 446. On September 26, 2007, Plaintiff was seen for a neurology consultation. *Id.* at 372-82, 439-43. Wendi I. Kulin, M.D. noted Plaintiff's neck range of motion was "limited by significant tremulousness and give-way weakness in [flexion and extension] – strength graded 4/5. AR at 374, 380, 442. Further, Dr. Kulin noted that Plaintiff's sternocleidomastoid muscles exhibited "similar tremulousness with effort[.]" *Id.* Plaintiff "denied pain with Neck [range of motion]/exam." *Id.* Dr. Kulin

1  found Plaintiff's upper extremities grip 4/5 on the left, as well as throughout all left upper

2  extremity muscle groups. *Id.* at 374, 380, 442. Additionally, Dr. Kulin noted "significant

3  give-way weakness." *Id.* The right upper extremity was 5/5 throughout. *Id.* Plaintiff's

4  lower extremity strength test was generally 4/5 on the left, and 5/5 on the right. AR at 374,

5  380, 442. Dr. Kulin noted that all left sided "motor strength testing was accompanied by

6  significant tremulousness." *Id.* Dr. Kulin did question whether Plaintiff embellished some

7  weakness, because he was "able to lift up leg, cross heel over opposite knee to put on

8  socks/shoes." *Id.* at 375, 381, 442.

9       On October 4, 2007, Plaintiff had an MRI of his thoracic spine without contrast. *Id.*

10  at 327-28. The MRI showed a "[n]ormal thoracic spine exam." *Id.* at 328. On October 11,

11  2007, Plaintiff underwent an electromyography ("EMG") and nerve conduction study. AR

12  at 369-70, 432-33, 437-38. The nerve conduction study was performed on the left median,

13  ulnar, peroneal, and tibial motor nerves, and the left median, ulnar, superficial peroneal

14  nerve, and sural sensory nerves. *Id.* at 369, 432. The EMG was performed on the left

15  deltoid, biceps, triceps, abductor pollicis brevis, first dorsal interosseus, tibialis anterior,

16  gastrocnemius, rectus femoris, and gluteus maximus. *Id.* Dr. Akhter noted that "[t]his

17  electrodiagnostic study [was] [within normal limits], indicating no evidence of peripheral

18  neuropathy, nor cervical radiculopathy." *Id.* at 370, 433. Dr. Akhter initially noted that

19  "there is the possibility of left L4/L5 radiculopathy[.]" *Id.* On follow up, however, he

20  determined that this was a "[t]echnical artifact seconadary [sic] to pain resulting in poor

21  volitional activity in the left lower extremity EMG testing." AR at 370, 433. On November

22  30, 2007, Dr. Kulin reviewed Plaintiff's thoracic spine MRI and noted a "normal study." *Id.*

23  at 432. She further stated that "[n]o further Neurology [follow up] needed." *Id.*

24       As of December 11, 2007, Plaintiff was "rated as unemployable due to service

25  connected disabilities[,] [and] he receives disability compensation at the 100% rate." *Id.* at

26  158. On December 13, 2007, Dr. Ballesteros reported that Plaintiff stated his "pain has been

27  managing well[,]" although he "has intermittent [low back pain recurrences and use of

28

thermo/cryo help to minimize his discomfort and to continue functional [sic]." *Id.* at 431.

Dr. Ballesteros noted that "today patient is feeling quite well and said that [he] does not need

[trigger point injections]." AR at 431. Upon examination, Dr. Ballesteros reported that

Plaintiff "appears healthy [and] in no distress." *Id.* Plaintiff was "ambulatory [and] uses [a]

cane." *Id.* Dr. Ballesteros further reported Plaintiff's neck active range of motion was within

normal limits, as was the active range of motion of his left upper extremity. *Id.* Strength was

5/5, and there was minimal tenderness in upper trapezius, rhomboids major and minor and

iliolumbar areas. *Id.* Dr. Ballesteros further reported that stability and vascular were both

within normal limits, and that Plaintiff was functionally independent in activities of daily

living. AR at 431.

On January 10, 2008, Plaintiff was seen by Huey-Fen Song, O.D. for blurred vision,

and eye pain. *Id.* at 365-68, 425-28. Dr. Song assessed "very mild hypertensive associated

retinopathy[,]" refractive error, and dry eye syndrome. *Id.* at 368, 428.

On March 14, 2008, Plaintiff saw Dr. Ballesteros and reported that his pain had

"reactivated in the last few weeks." *Id.* at 418. Dr. Ballesteros found that Plaintiff's active

range of motion in his neck and left upper extremity were within normal limits, his strength

5/5, and "exquisite tenderness in l[eft] upper [trapezius]" on palpation. *Id.* No trigger point

injections were given, however, "they were postponed when patient really need [sic] them."

*Id.* On March 19, 2008, the Department of Veterans Affair wrote a letter certifying that

Plaintiff "has a service connected disability rating of 80% and receiving VA benefits at the

100% rate due to individual unemployability." AR at 198. Plaintiff "is considered 100%

permanent and total." *Id.* On September 9, 2008, Plaintiff completed an Exertional Daily

Activities Questionnaire. *Id.* at 127. Plaintiff indicated that he had four (4) sons under ten

(10) "that take up most of my day." *Id.* Additionally, Plaintiff stated that he napped each

day for one (1) to three (3) hours, and watched television, walk or stretched to fill the rest of

his day. *Id.* at 127-28. Plaintiff estimated that the farthest he could walk is just under a

block. AR at 127. Plaintiff noted that he did not do his own grocery shopping or clean his

own home, cook, laundry, yard work or other household chores. *Id.* at 128. Plaintiff indicated that he did drive a care, but had to be careful due to his medication. *Id.* Prior to his disability, Plaintiff was a single parent raising his children and taking care of the house, as well as working for Waste Management. *Id.* Plaintiff notes that he "just started using a cane to help me walk and keep me from falling with the spine disorder I have[,] I will be back in a wheelchair to soon." *Id.* at 129.

On May 5, 2008, Plaintiff saw Dr. Adamczyk and presented as "uncomfortable appearing[,]" and "walking with cane slowly[.]" AR at 412. Dr. Adamczyk reviewed Plaintiff's medications, and Nurse Cain screened Plaintiff for abuse and neglect, depression, and post traumatic stress disorder, all of which were had negative results. *Id.* at 412-14. On May 15, 2008, Dr. Ballesteros performed a trigger point injection into Plaintiff's left rhomboids, major and minor. *Id.* at 406-09. Dr. Ballesteros reported that Plaintiff "had prompt pain relief." *Id.* at 408. Dr. Ballesteros also provided Plaintiff with back stretching and aquatic exercises. *Id.*

On June 3, 2008, Plaintiff saw Robert D. Spruance, O.D. regarding photophobia. AR at 359-61, 402-05. Dr. Spruance reported "no ocular findings[,] [and] . . . refractive error." *Id.* at 361, 405. Plaintiff was given a prescription for tinted glasses. *Id.* On June 24, 2008, Plaintiff saw Dr. Ballesteros. *Id.* at 399. Dr. Ballesteros reported that Plaintiff is "noticing positive pain improvement[,] [and] . . . does his exercises daily obtaining good results." Plaintiff reported that he did not need trigger point injections, and that his pain has been at a tolerable level. *Id.* Dr. Ballesteros reported that Plaintiff's active range of motion in his neck and left upper extremity were within normal limits, and strength 5/5. AR at 399. Additionally, Dr. Ballesteros noted minimal tenderness in the left upper trapezius muscle on palpation. *Id.* at 399. Dr. Ballesteros commented that "patient has remarble [sic] improvement in his upper back pain." *Id.*

On September 26, 2008, Plaintiff returned to Dr. Ballesteros. *Id.* at 680-82. Upon examination Dr. Ballesteros noted "pain and slowing function." *Id.* at 681. Dr. Ballesteros

1    performed trigger point injection of Plaintiff's left rhomboids major and minor and upper

2    trapezius muscle.  AR at 680.  Dr. Ballesteros further noted that Plaintiff "had prompt pain

3    relief."  *Id.* at 681.

4            On October 10, 2008, Plaintiff's medical records were also reviewed by Robert S.

5    Hirsch, M.D. and a Physical Residual Functional Capacity Assessment completed based

6    upon that review.  *Id.* at 620-27.  Dr. Hirsch found that Plaintiff could occasionally lift

7    twenty (20) pounds, and frequently lift ten (10) pounds.  *Id.* at 621.  Dr. Hirsch further found

8    that Plaintiff could both stand and/or walk, as well as sit, (with normal breaks) for a total of

9    about six (6) hours in an eight (8) hour workday.  *Id.*  Dr. Hirsch further found Plaintiff to

10   be unlimited in his ability to push and/or pull (including operation of hand and/or foot

11   controls).  AR at 621.  Dr. Hirsch determined that Plaintiff could occasionally climb ladders,

12   ropes, and scaffolds, as well as crawl, and could frequently climb ramps and stairs, balance,

13   stoop, kneel, and crouch.  *Id.* at 622.  Dr. Hirsch found Plaintiff limited in reaching all

14   directions (including overhead), concluding that Plaintiff could reach above shoulder level

15   up to two-thirds of the time, but that Plaintiff was unlimited in handling, fingering and

16   feeling.  *Id.* at 623.  Dr. Hirsch reported no visual or communicative limitations.  *Id.* at 623-

17   24.  Dr. Hirsch found Plaintiff should avoid concentrated exposure to hazards, but was

18   unlimited regarding extreme cold, extreme heat, wetness, humidity, noise, and vibration.  *Id.*

19   at 624.  On October 31, 2008, Plaintiff received an influenza vaccine.  AR at 678.

20           On November 28, 2008, Joan M. Threadgold, Pharm.D. "[c]ontacted [patient]

21   regarding tapering of morphine and new clonidine patch to help withdrawal [symptoms]."

22   *Id.* at 677.  "[Plaintiff] stated his current pain is not controlled and if dose is decreased he will

23   end up in the emergency room/hospital."  *Id.*

24           On December 2, 2008, Plaintiff saw Dr. Adamczyk regarding his pain medications.

25   *Id.* at 668-74.  Plaintiff stated, "[I]'m going to run up a f"king bill until [I] get what [I] need

26   for meds."  *Id.* at 668 (alteration in original) (capitalization added).  Dr. Adamczyk reported

27   that Plaintiff appeared healthy and "walking slowly without assist[.]"  AR at 670.  Plaintiff

28

was "vehement about not tapering off" morphine. *Id.* at 671.  On December 4, 2008, Sonia

M. Perez-Padilla, M.D. concurred with Dr. Adamczyk's assessment, noting that "no one in

primary care will feel comfortable renewing [morphine at] this dose." *Id.* at 672.  On

December 19, 2008, Plaintiff received trigger point injections in his left rhomboids major and

minor, and upper trapezius muscle from Dr. Ballesteros. *Id.* at 663-65.  Dr. Ballesteros

reported that "patient continues receiving benefits from [trigger point injections], [but]

patient needs new [trigger point injections] because the pain is reactivated." *Id.* at 663.  On

December 23, 2008, Plaintiff failed to attend his appointment with psychologist. AR at 663.

On January 20, 2009, Plaintiff's significant other contacted the clinic reporting that

"there was a miscommunication and [patient] did not decrease morphine 30mg SR to from

[three times daily] to [twice daily] as noted above." *Id.* at 667.  She further stated that "[t]hey

were under the impression that there would be no furhter [sic] changes until [primary care

physician] [follow up] in Feb[ruary] and therefore did not pay attention to the directions on

the bottle." *Id.*  Dr. Adamczyk approved a ten (10) day tapering dose. *Id.*

On February 3, 2009, Plaintiff's "friend" called Dr. Hoyer stating that Plaintiff "is

hurting so bad that [he] is unable to move" and that he "simply lays in bed and jerks and

moans" since the reduction in his morphine dosage. *Id.* at 660.  On February 5, 2009,

Plaintiff was seen by Vicky McManaman, patient advocate, regarding the reduction in his

pain medication. AR at 659.  Ms. McManaman contacted Dr. Ballesteros to see if he can be

seen sooner for his trigger point injections. *Id.*  On February 9, 2009, Plaintiff was seen by

Dr. Adamczyk. *Id.* at 654-59.  Plaintiff complained that he is "now confined to couch"

because "it took years to get to the high doses [of morphine] that worked[.]" *Id.* at 654.

Plaintiff further reported that his "back gives out" causing him to fall. *Id.*  Dr. Adamczyk

noted that Plaintiff was "walking with cane with difficulty and slowly[.]"  AR at 656.  Dr.

Adamczyk further noted a referral to the "seating committee" for a scooter. *Id.* at 654.  A

depression screen on this same date was positive. *Id.* at 658.  On February 10, 2009, Denise

M. O'Connell, social worker, called Plaintiff's home regarding home health aide/homemaker

1   services. *Id.* at 644, 653. Ms. O'Connell spoke with Plaintiff's wife and explained that

2   homemaker service are not authorized through the Veterans Affairs "if that is the only

3   service needed." *Id.* The following day, Kristy Lefeve, LMSW followed up with Plaintiff's

4   wife, but did not speak with Plaintiff. AR at 644, 653. On February 26, 2009, Plaintiff saw

5   Dr. Koschorke and reported "that he has episodes of sudden falls, mainly weakness in left

6   leg, he does not have any symptoms prior to the falls, [and] no bowel bladdrer [sic]

7   problems." *Id.* at 648, 707. Plaintiff further reported "that sometimes he can not get up by

8   himself after he falls." *Id.* Plaintiff further reported noticing "sudden weakness in mainly

9   left upper arm and sometimes some tingling[.]" *Id.* Additionally, Plaintiff complained of

10  now "constant headaches[,] [which] he feels [are] secondary to his decrease in morphine."

11  *Id.* Plaintiff also attributed his increase in falls to the morphine decrease. AR at 648, 707.

12  Plaintiff reported "some chestpain[.]" *Id.* Plaintiff stated that "the pain is better with

13  medication and tens unit[.]" *Id.* at 648, 708. Trigger point injections also help. *Id.* Dr.

14  Koschorke did not note any muscle atrophy, and found upper extremity strength 5/5 with

15  coaching, and right lower extremity strength 5/5, with left lower extremity 4/5 secondary to

16  severe pain. *Id.* at 652, 711. Dr. Koschorke further noted severe pain to palpation in left

17  paraspinous cervical muscle, left deltoid and mid trapezius, right and left midthoracic and

18  paraspinous lumbar muscles. *Id.* Dr. Koschorke determined Plaintiff's lumbar spine flexion

19  at 60 degrees, and increase in left and right pain; extension resulted in minimal increase in

20  pain; rotation and side bending increased pain, more toward the left than right. AR at 652,

21  711-12. Straight leg raises in sitting position were within normal limits on the right and on

22  left at 40 degrees increase in spine pain. *Id.* at 652, 712. Lower extremity motion was within

23  normal limits, and apparent sacroiliac joint pain. *Id.*

24       On March 3, 2009, Plaintiff saw Andrew C. Jones, Ph.D. for an initial psych

25  evaluation. *Id.* at 646-47, 705-07. Plaintiff reported his typical day as "primary caretaker

26  for his four sons (also has two daughters in college)." *Id.* at 646, 706. Plaintiff further

27  reported that he "spends time with [his] sons when [they] return home from school." *Id.*

28

1    Additionally, he "[w]ill go shooting with friends and sons on weekends." AR at 646, 706.

2    Plaintiff reported a "recent improvement in sleep with start of nortriptyline and increase in

3    morphine." *Id.* Dr. Jones noted that Plaintiff had a "minimal" level of emotional distress,

4    although he experienced "significant affective distress when morhpine [sic] dosage was

5    decreased." *Id.* Dr. Jones recommended "[n]o further pain psychology intervention at this

6    time." *Id.* at 647, 707. On March 9, 2009, Plaintiff completed an Exertional Daily Activities

7    Questionnaire. *Id.* at 143. Plaintiff stated he lived alone, and his typical day included

8    waking up, taking his morning medication, and waiting for it to work. AR at 143. Plaintiff

9    further stated that his medications "have been cut due to the State's new ruling." *Id.* Plaintiff

10   also asserted that he is "now confined to [his] home because the decrease in [his] pain

11   med[ication]s means a decrease in [his] mobility." *Id.* Plaintiff states that his pain level "has

12   spiked to the max" and that he "can not move about any long[er], and ha[s] scheduled

13   appointment with the VA to recieve [sic] a scooter to get around due to the number of falls

14   in the last few months w[ith] the decrease of pain medication[.]" *Id.* Plaintiff reported that

15   he now has "trouble getting from the couch to the bathroom[,] and [a] walk to get the mail

16   out of the mailbox requires the use of a cane." *Id.* Plaintiff further reported that he cannot

17   "lift or carry anything over 5 [pounds]." AR at 144. Plaintiff noted that he doe not grocery

18   shop or clean his home, cook, do laundry, yard work or other household chores. *Id.* Plaintiff

19   indicated that he can only drive a car for a short trip, and that there are "no longer any

20   activities that [he] can do[,] [because] [t]he decrease of pain med[ication]s have confined

21   [him] to the house and couch. *Id.* Plaintiff reported that he does not take naps, despite laying

22   down every day. *Id.* On March 25, 2009, Plaintiff saw Dr. Koschorke for a follow up. *Id.*

23   at 703. Plaintiff stated "that he had his leg slip only once[,] [and] [h]e is able to sleep much

24   better." AR at 703. Plaintiff further reported that the Tizanidine and Nortriptyline are

25   helping. *Id.* at 704. Plaintiff "was amazed that he could decrease his opioids without too

26   much additional pain." *Id.* Dr. Koschorke noted Plaintiff "looking actually good" with his

27   gait "upright using cane." *Id.*

28

1       On April 22, 2009, Plaintiff returned to Dr. Koschorke for a follow up. *Id.* at 699-701.

2   Plaintiff reported that "he is gettign [sic] minimal relief from the medications (opioids)[.]"

3   AR at 701.  Plaintiff further reported that he is not sleeping well. *Id.*  Upon examination, Dr.

4   Koschorke noted "no sedation[,] no acute distress[.]" *Id.*   Plaintiff's gait was "upright

5   slow[.]" *Id.*  Plaintiff also reported that he feels the aquatics therapy is helping "some." *Id.*

6       On May 11, 2009, pursuant to request by the Commissioner upon reconsideration,

7   Charles Fina, M.D. reviewed Plaintiff's medical records and affirmed the initial residual

8   functional capacity indicating light function. *Id.* at 714.  On May 13, 2009, Andres Kerns,

9   Ph.D. reviewed Plaintiff's medical records and completed a Psychiatric Review Technique.

10   AR at 715-28.  Dr. Kerns found "[n]o [m]edically [d]eterminable [i]mpairment[.]" *Id.* at 715.

11       On October 1, 2010, pursuant to request by the Commissioner, Plaintiff saw Enrique

12   Suarez, M.D. for a consultative examination. *Id.* at 751-53.  Upon physical examination, Dr.

13   Suarez reports that Plaintiff was "in a minimal degree of distress." *Id.* at 752.  Plaintiff's left

14   shoulder exhibited limited range of motion on flexion and internal rotation. *Id.*  Dr. Suarez

15   reported the right upper extremity to have a normal range of motion, and Plaintiff's hand

16   grips are normal bilaterally.  AR at 752.  Dr. Suarez further reported that Plaintiff's lower

17   extremities showed "a normal range of motion of the hips, knees[,] and ankle joints." *Id.*

18   Further, Dr. Suarez reported Plaintiff's ambulation as "normal." *Id.*  Dr. Suarez noted that

19   Plaintiff drove to the appointment, and opined that "he should be able to return to some

20   activities." *Id.*  Dr. Suarez further opined that Plaintiff could not lift over forty (40) to fifty

21   (50) pounds occasionally, and twenty-five (25) pounds frequently, with limitation of the left

22   shoulder. *Id.* at 753.  Additionally, Dr. Suarez completed a Medical Source Statement of

23   Ability to do Work-Related Activities (Physical).  AR at 757-62.  Dr. Suarez found Plaintiff

24   able to lift and carry eleven (11) to twenty (20) pounds frequently, and twenty-one (21) to

25   fifty (50) pounds occasionally. *Id.* at 757.  Dr. Suarez further found Plaintiff able to sit,

26   stand, and walk for eight (8) hours at one time without interruption, as well as total in an

27   eight (8) hour work day. *Id.* at 758.  Dr. Suarez reported that Plaintiff did not use a cane to

28

ambulate.  *Id.*  Dr. Suarez found that Plaintiff could continuously reach, both overhead and all other forms, handle, finger, feel, and push or pull with his right hand.  *Id.* at 759.  Dr. Suarez further found that with his left hand Plaintiff could frequently handle, finger, feel, push or pull, and occasionally reach overhead or reach in other ways.  AR at 759.  Dr. Suarez found that Plaintiff could operate foot controls continuously with either foot.  *Id.*  Dr. Suarez determined that Plaintiff could frequently climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, and crawl.  *Id.* at 760.  Dr. Suarez further indicated no hearing or visual impairments.  *Id.*  With regard to environmental limitations, Dr. Suarez determined that Plaintiff could continuously tolerate unprotected heights; moving mechanical parts; operating a motor vehicle; humidity and wetness; dust, odors, fumes and pulmonary irritants; extreme cold; extreme heat; vibrations; and other, including very loud noise.  *Id.* at 761.  Dr. Suarez also found that Plaintiff could perform activities like shopping; traveling without a companion for assistance; ambulate without using a wheelchair, walker, or two (2) canes or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle, or use paper/files.  AR at 762.

## II.     STANDARD OF REVIEW

     The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

     Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

1   873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098.  Further, substantial evidence is

2   "such relevant evidence as a reasonable mind might accept as adequate to support a

3   conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can

4   support either outcome, the court may not substitute its judgment for that of the ALJ."

5   *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992));

6   *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Moreover, the court may

7   not focus on an isolated piece of supporting evidence, rather it must consider the entirety of

8   the record weighing both evidence that supports as well as that which detracts from the

9   Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

10

11  **III.   ANALYSIS**

12         The Commissioner follows a five-step sequential evaluation process to assess whether

13  a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:

14  Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not

15  disabled; step two considers if the claimant has a "severe medically determinable physical

16  or mental impairment[.]" If not, the claimant is not disabled; step three determines whether

17  the claimant's impairments or combination thereof meet or equal an impairment listed in 20

18  C.F.R. Pt. 404, Subpt. P, App. 1.  If not, the claimant is not disabled; step four considers the

19  claimant's residual functional capacity and past relevant work.  If claimant can still do past

20  relevant work, then he or she is not disabled; step five assesses the claimant's residual

21  functional capacity, age, education, and work experience.  If it is determined that the

22  claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. §

23  404.1520(a)(4)(i)-(v).

24         In the instant case, the ALJ found that Plaintiff was not engaged in substantial gainful

25  activity since June 7, 2006.  AR at 26.  At step two of the sequential evaluation, the ALJ

26  found that "[t]he claimant has the following severe impairments: degenerative joint disease

27  of the lumbar and cervical spine and fracture of the left upper extremity (20 CFR

28

404.1520(c)).” *Id.* At step three, the ALJ found that Plaintiff “does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).” *Id.* at 27. The ALJ found that “[a]fter careful consideration of the entire record, . . . the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) except the claimant can occasionally reach overhead with his non-dominant left arm/shoulder.” *Id.* At step four, the ALJ determined that Plaintiff “is unable to perform any past relevant work (20 CFR 404.1565).” *Id.* at 32. At step five, the ALJ found that “[c]onsidering the claimant’s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).” *Id.* at 33. Ultimately, the ALJ determined that “the claimant has not been disabled within the meaning of the Social Security Act[.]” *Id.* Plaintiff asserts that the ALJ erred in “making an adverse credibility determination regarding the Plaintiff’s complaints of symptoms and the effect on his ability to function[;]” determining that “the Commissioner’s examining physician is entitled to ‘substantial weight[;]’” and “in his analysis of the relevance of the VA’s determination that the Plaintiff has a 100% service connected disability.” Pl.’s Opening Br. (Doc. 29) at 2.

### A. *Plaintiff’s Credibility*

“To determine whether a claimant’s testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis.” *Lingenfelter v. Astrue*, 204 F.3d 1028, 1035-36 (9th Cir. 2007). First, “a claimant who alleges disability based on subjective symptoms ‘must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]’” *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *See also Lingenfelter*, 504 F.3d at 1036. Further, “the claimant need not show that [his] impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it

- 31 -

1   could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282

2   (citations omitted). "[I]f the claimant meets this first test, and there is no evidence of

3   malingering, 'the ALJ can reject the claimant's testimony about the severity of [his]

4   symptoms only by offering specific, clear and convincing reasons for doing so.'"

5   *Lingenfelter*, 504 F.3d 1028 (quoting *Smolen*, 80 F.3d at 1281). "Factors that an ALJ may

6   consider in weighing a claimant's credibility include reputation for truthfulness,

7   inconsistencies in testimony or between testimony and conduct, daily activities, and

8   'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed

9   course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v.*

10   *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

11          Here, the ALJ determined that "the claimant's medically determinable impairments

12   could reasonably be expected to cause the alleged symptoms; however, the claimant's

13   statements concerning the intensity, persistence and limiting effects of these symptoms are

14   not credible to the extent they are inconsistent with the residual functional capacity

15   assessment." AR at 28. As such, Plaintiff has met the first step. *See Smolen*, 80 F.3d at

16   1281-82. The ALJ further found that:

17          The claimant has described a broad range of daily activities. The claimant
           cares for young children at home, which can be quite demanding both
18         physically and emotionally, without any particular assistance. The claimant
           completed a Function Report in September 2008. (4E). The claimant reported
19         that on an average day he took care of his four sons under ten years old, and
           that took up most of his day. He also took a nap every day for a couple of
20         hours and then watched television. The claimant reported he also walked and
           stretched. (4E/1). The claimant described activities outside the home such as
21         riding around in a vehicle with his sons and going shooting and camping with
           them. Yet, in this same report, the claimant stated the farthest he had been able
22         to walk since 2004 is just under a block. (4E/1). The claimant's alleged onset
           date for being disabled is as of June 2006. That the claimant could only walk
23         a block back in 2004 without having difficulties is inconsistent with his work
           history where he last worked until June 2006, a job at which he walked a total
24         of 8 hours each day. (2E/3). In March 2009, the claimant reported to the VA
           that his daily activities also consisted of taking care of his four sons and that
25         he spends time with them when they return from school. The claimant stated
           he has four good hours a day for activity and reported having learned good
26         pacing skills. He goes shooting with his friends and sons on the weekends.
           (5F/16). In Feb 2009, a social worker with the VA called claimant twice to
27         discuss whether he required home health aide/homemaker services.

28

1
2
3
4

> Homemaker service through the VA is not authorized if that is the only service needed. The claimant never returned the calls. The claimant reported his activities of daily living were very restricted due to his impairments, yet he did not return the call to the VA social worker to request additional assistance. Claimant's failure to seek assistance with his daily activities undermine the credibility of his statements regarding the debilitating nature of his alleged impairments. The claimant has provided inconsistent information regarding his ability to perform daily activities.

5
6
7
8
9
10
11
12
13
14
15

AR at 28-29. The ALJ also considered that Plaintiff's "allegations of severe pain are not corroborated by the treating sources." *Id.* Additionally, Plaintiff has received conservative treatment, which "has been generally successful in controlling those symptoms. *Id.*; *see also* AR at 399, 418, 501, 507-08, 648, 681, 701, 704, 708. The ALJ's reasons for an adverse credibility finding include "inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Upon reviewing the record as a whole, this Court concludes that the ALJ stated sufficient specific reasons for not fully crediting Plaintiff's testimony.

16

### **B.      *Dr. Suarez's Opinion***

17
18
19
20
21
22
23
24
25
26
27

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *See also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v.*

28

*Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).  Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it."  *Id.*  (citing *Cotton*, 799 F.2d at 1408).  Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).  Also, "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  20 C.F.R. § 404.1527(c)(4).

Plaintiff argues "that Dr. Suarez's 'objective' findings on clinical exam as well as his opinion is very inconsistent with most other doctor's findings and diagnoses[,]" and therefore, should not be "entitled to any weight."  Pl.'s Opening Br. (Doc. 29) at 14. Defendant argues that the AlJ's reliance was reasonable, and that Plaintiff's objections to Dr. Suarez beyond the minimum requirements for a consultative examiner under Section 404.1519g(b), 20 C.F.R., are misplaced.  Def.'s Ans. Br. (Doc. 30) at 14-15.  The Court recognizes that the agency regulations only require that a consultative examiner be licensed; however, the Court further notes that apparently Dr. Suarez "was removed from the panel entitled to examine disability applicants[.]" AR at 193.

With respect to Dr. Suarez's opinion, the ALJ stated in relevant part:

> As for the opinion evidence, the undersigned accords significant weight to the consultative examiner.  Dr. Suarez reviewed the medical evidence, including treating records and performed a medical examination and clinical review. His observations and conclusions are consistent with the record as a whole and consistent with the above listed residual functional capacity.

AR at 32.  Although the ALJ provided a detailed and thorough summary of the medical evidence, he did not address the conflicts between Plaintiff's treating physicians' notes and Dr. Suarez's report.  *See* AR at 332-33, 374, 380, 412, 418, 431, 442, 444-45, 464, 491, 494-

96, 507, 509, 512, 591, 610, 652, 681, 701, 711-12; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 ("The ALJ can meet [the burden for rejecting a treating physician's opinion] by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings." *Id.* (citations omitted)).  Moreover, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" *Orn*, 495 F.3d at 632.  To the extent that Dr. Suarez's conclusions differ from those put forth by Plaintiff's treating physicians, the ALJ failed to set forth "specific and legitimate" reasons supported by "substantial evidence in the record" for his reliance on Dr. Suarez.  *See, e.g., Rollins*, 261 F.3d at 856.

### C.      Veterans' Affairs Disability Rating

"[A]lthough a VA rating of disability does not necessarily compel the SSA to reach an identical result, 20 C.F.R. § 404.1504, the ALJ must consider the VA's finding in reaching his decision." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).  Furthermore, "[b]ecause social security disability and VA disability programs 'serve the same governmental purpose – providing benefits to those unable to work because of a serious disability,' the ALJ must give 'great weight to a VA determination of disability.'" *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1225 (9th Cir. 2010) (quoting *McCartey*, 298 F.3d at 1076).  "Nevertheless, '[b]ecause the VA and SSA criteria for determining disability are not identical,' [the Ninth Circuit Court of Appeals has] allowed an ALJ to 'give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record.'" *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 695 (9th Cir. 2009) (quoting *McCartey*, 298 F.3d at 1076).  Noting "that the SSA is not bound by the VA's determination[, however,] is not a 'persuasive, specific, valid reason[ ]' for discounting the VA determination." *Berry v. Astrue*, 522 F.3d 1228, 1236 (9th Cir. 2010).

Here, regarding the VA's disability rating, the ALJ stated, in relevant part:

The evidence also shows that the Department of Veterans Affairs determined that the claimant had a 100 percent VA disability rating due to his service-connected disabilities. This determination was made by another agency based on their rules and is not binding on the Social Security Administration. The U.S. Veterans' Compensation Program is designed to compensate a veteran for injuries and diseases acquired with in military service, and it not [sic] designed to determine an individual's ability to perform work-related activities outside of the military system. The medical evidence of record shows that the claimant is not under a disability within the meaning of the Social Security Act and Regulations. (SSR 06-03p).

AR at 32. Plaintiff argues that "the VA disability rating is entitled to great weight in this case." Pl.'s Opening Br. (Doc. 29) at 16. Conversely, Defendant argues that "Plaintiff's VA rating was inapt as a measure of whether he was disabled under the definition applicable in the Social Security context[,] . . . [and] [i]t was therefore reasonable for the ALJ to choose to give the VA's determination no weight. Def.'s Ans. Br. at 17. The ALJ, however, simply mentioned the different purposes between the VA disability rating and a finding of disability under the Social Security Act, with only passing reference to the medical evidence. The Court finds that this does not qualify as persuasive, specific, valid reasons for disregarding the VA disability rating. *Cf Valentine*, 574 F.3d at 695 (according VA disability rating little weight on the basis of "new evidence or a properly justified reevaluation of old evidence constitutes persuasive, specific, valid reason[s].").

### D. Determination of Benefits

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence

1  credited.

2  *Benecke,* 379 F.3d at 593 (citations omitted).  Where the test is met, "we will not remand

3  solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony

4  to be established as true and remand for an award of benefits."  *Id.* (citations omitted); *see*

5  *also Lester*, 81 F.3d at 834.

6        Here, to the extent that Dr. Suarez's conclusions differ from those put forth by

7  Plaintiff's treating physicians, the ALJ failed to set forth "specific and legitimate" reasons

8  supported by "substantial evidence in the record" for his reliance on Dr. Suarez.  *See Lester*,

9  81 F.3d at 830; AR at 32.  Further, the ALJ did not provide persuasive, specific, valid reasons

10  for disregarding the VA disability rating.  *See McCartey*, 298 F.3d at 1076; AR at 32.  The

11  Court will exercise its discretion not to award benefits, because "there may be evidence in

12  the record to which the ALJ can point to provide the requisite specific and legitimate

13  reasons" his reliance on Dr. Suarez's opinion.  *Salvaldor v. Sullivan*, 917 F.2d 13, 15 (9th

14  Cir. 1990).  There also may be evidence in the record which the ALJ can point to support his

15  disregarding the VA disability rating.  "[T]he Secretary is in a better position then this Court

16  to perform th[ese] task[s]."  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).

17

18  **IV.  MOTION TO EXCEED PAGE LIMIT**

19        Plaintiff filed a Plaintiff's Motion to Allow Plaintiff's Opening Brief to Exceed Page

20  Length filed with his Opening Brief (Doc. 29). As an initial matter, it is improper to include

21  a motion for miscellaneous relief as an addendum to the Opening Brief.  *See* LRCiv. 16.1

22  (delineating the contents of an opening brief); *see also* LRCiv. 7.1 (proper form of papers).

23  Furthermore, Plaintiff was previously directed to "file an amended opening Brief, no more

24  than twenty-five (25) pages in length[,] . . . and Plaintiff's amended Opening Brief shall fully

25  comply with LRCiv. 16.1." Order 1/2/14 (Doc. 28).  As an initial matter, Plaintiff's counsel

26  is reminded that requests for relief separate from judicial review of the Commissioner's

27  decision should be made in a separately filed motion.  Furthermore, the Court gave express

28

directions as to the length and content of Plaintiff's amended Opening Brief. As such, Plaintiff's Motion to Allow Plaintiff's Opening Brief to Exceed Page Length is DENIED.

## V.   CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)    Carolyn W. Colvin, Acting Commissioner of Social Security, is **substituted as Respondent** for Michael Astrue pursuant to Rule 25(d) of the Federal Rules of Civil Procedure;

2)    Plaintiff's Opening Brief (Doc. 29) is GRANTED;

3)    The Commissioner's decision is REVERSED and REMANDED;

4)    Upon remand, the Appeals Council will remand the case back to an ALJ with instructions to issue a new decision regarding Plaintiff's eligibility for disability insurance benefits. The ALJ will give further consideration to the medical opinions of record and articulate what weight is given to each, as well as, give further consideration to Plaintiff's VA disability rating and articulate what weight, if any, it was given.

5)    The Clerk of the Court shall enter judgment, and close its file in this matter.

DATED this 31st day of March, 2014.

_____
Bruce G. Macdonald
United States Magistrate Judge

- 38 -